UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| JENESTA CUTTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 19-443-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ETHICON, INC., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This action was remanded from the United States District Court for the Southern District of West Virginia multidistrict litigation ("MDL") *In re Ethicon, Inc., Pelvic Repair Systems Products Liability Litigation*, 2: 12-md-2327. The MDL involves allegedly defective women's polypropylene-based mesh products manufactured by Defendant Ethicon, Inc., a wholly owned subsidiary of Defendant Johnson & Johnson (collectively "Ethicon" and "the defendants"). Plaintiff Jenesta Cutter was implanted with an Ethicon posterior Prolift device in 2006 to treat pelvic organ prolapse. [1]

The parties have identified outstanding motions to exclude the case-specific and general causation testimony of numerous expert witnesses pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). [Record Nos. 128, 144, and 146] Some of these motions were not addressed prior to remand while others involve MDL rulings that were not specifically adopted in the Cutter case and/or contain issues on

---

[1] Jenesta Cutter's husband, Larry Cutter, initially was a party to this lawsuit. [Record No. 27] However, the Court dismissed Larry's sole claim for loss of consortium on summary judgment. [Record No. 148] As a result, Jenesta Cutter is the only plaintiff who maintains active claims.

which the MDL court reserved ruling. [*Id.*] Having examined the record, the Court has also found two additional *Daubert* motions that were not mentioned by the parties with MDL opinions that reserve ruling on certain issues. [Record Nos. 91 and 92] This opinion is intended to resolve all outstanding *Daubert* motions and outstanding issues within those motions.

## I.  The Outstanding Motions

It appears that fourteen *Daubert* motions require some amount of action by the Court.

First, there are unadopted MDL opinions concerning *Daubert* motions that seek to exclude or limit the testimony of general causation experts (*i.e.*, experts who Ethicon and the MDL plaintiffs might call to testify in a broad range of cases aggregated in the MDL). The MDL court issued opinions that were not adopted in Cutter's case on the defendants' motions concerning the following five plaintiff experts: Dr. Med. Uwe Klinge [MDL Record Nos. 1978 (*Daubert* motion) and 2642 (MDL opinion)], Dr. Bruce Rosenzweig, M.D. [MDL Record Nos. 2047 (*Daubert* motion) and 2668 (MDL opinion)], Dr. Vladimir Iakovlev, M.D. [MDL Record Nos. 2066 (*Daubert* motion) and 2710 (MDL opinion)], Dr. Peggy Pence, PH.D. [MDL Record Nos. 2075 (*Daubert* motion) and 2664 (MDL opinion)], and Dr. Daniel Elliott, M.D. [MDL Record Nos. 2082 (*Daubert* motion) and 2666 (MDL opinion)].[2]  All of these opinions reserve ruling on some issues, and the defendants have submitted supplemental briefs

---

[2] The Court cites to the MDL motions, briefs, and opinions concerning "Wave 1 cases" of the MDL.  Cutter was a Wave 2 case, but as the parties have indicated, the parties' Wave 1 *Daubert* motions were subsequently adopted in Wave 2 cases, including *Cutter*.  [Record No. 144 n. 1] The initial briefs and opinions concerning the Wave 1 cases contain the substantive arguments and rulings.  For simplicity, the Court cites to these documents.

regarding the general causation testimony of Iakovlev, Pence and Elliott. [Record Nos. 149-51] Cutter has not submitted supplemental briefs regarding the five motions.

The MDL court also issued opinions that were not adopted in Cutter's case on the MDL plaintiffs' *Daubert* motions concerning the following four defense experts: Dr. Roger McLendon, M.D. [MDL Record Nos. 2009 (*Daubert* motion) and 2720 (MDL opinion)], Dr. Stephen Factor, M.D. [MDL Record Nos. 2015 (*Daubert* motion) and 2670 (MDL opinion)], Dr. Shelby Thames, PH.D. [MDL Record Nos. 2039 (*Daubert* motion) and 2723 (MDL opinion)], and Timothy Ulatowski, M.S. [MDL Record Nos. 2060 (*Daubert* motion) and 2649 (MDL opinion)]. These opinions likewise reserve ruling on certain issues, and the parties have not submitted supplemental briefs concerning these motions.

Additionally, three MDL opinions regarding *Daubert* motions seeking to exclude or limit general causation experts have been adopted in Cutter's case. These include opinions addressing the MDL plaintiffs' motions to exclude the testimony of three defense experts: Dr. Michael Karram, M.D. [Record No. 90], Dr. Larry Sirls, M.D. [Record No. 91], and Dr. Mareeni Stanislaus, M.D. [Record No. 92]. However, like the unadopted opinions, these opinions contain unresolved issues that warrant Court action.

Finally, Ethicon has two pending *Daubert* motions concerning case-specific testimony of two experts: Rosenzweig and Iakovlev. [Record Nos. 78 and 80] The MDL court did not address these motions at all.

In summary, there are fourteen motions that require some action. The Court will address these groups of opinions and motions in turn.

## II.  The Unadopted MDL Court Opinions as the Law of the Case

Under the law of the case doctrine, the Court should adopt all of the MDL's opinions regarding the outstanding *Daubert* motions to the extent possible.  This is because, "[u]nder the doctrine of the law of the case, a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation." *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)).  "This doctrine applies with equal vigor to the decisions of a coordinate court in the same case and to a court's own decisions." *Id.* (citing *Christianson*, 486 U.S. at 816).  Although it does not appear that the United States Court of Appeals for the Sixth Circuit has addressed the law of the case doctrine's applicability after remand from a MDL, other circuits and courts within this circuit have found that the doctrine applies to rulings rendered by a MDL court prior to remand.  *E.g.*, *In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009); *In re Multi Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 678 (D.C. Cir. 1981); *Mathews v. Novartis Pharmaceuticals Corp.*, No. 3: 12-cv-314, 2013 WL 5780415, at *16 (S.D. Ohio Oct. 25, 2013); *Smith v. Pfizer, Inc.*, 688 F. Supp. 2d 735, 752 (M.D. Tenn. 2010); *In re Welding Fume Prods. Liability Litig.*, 1: 03-CV-17000, 2010 WL 7699456, at *2 (N.D. Ohio June 4, 2010).

The doctrine "is discretionary when applied to a coordinate court or the same court's own decisions." *E.g.*, *Bowling v. Pfizer Inc.*, 132 F.3d 1147, 1150 (6th Cir. 1998) (citing *Todd*, 920 F.2d at 403).  Thus, extraordinary circumstances may warrant revisiting a previously decided issue if the coordinate court's ruling was "clearly erroneous or would work a manifest injustice." *Holloway v. Brush*, 220 F.3d 767, 785 (6th Cir. 2000) (quoting *Christianson*, 486 U.S. at 817).

- 4 -

It may be arguable that the nine relevant unadopted MDL opinions do not constitute the law of the case because they were not adopted in this specific case; however, the Court finds that they are, in fact, the law of the case. These rulings substantively determined issues related to *Daubert* motions and expert testimony in Cutter's case, and they could have been adopted prior to remand. Caselaw also indicates that MDL rulings on general causation *Daubert* motions are the law of the case. *E.g.*, *Mathews*, 2013 WL 5780415, at *16. And treating issues resolved in a MDL as the law of the case generally accords with the purpose of 28 U.S.C. § 1407: that is, promoting judicial efficiency by coordinating and consolidating pretrial proceedings. *See Mathews*, 2013 WL 5780415, at *16 (citing *Deutsch v. Novartis Pharmaceuticals Corp.*, 768 F. Supp. 2d 420, 428-29 (E.D.N.Y. 2011); *In re Welding Fume Prods. Liability Litig.*, 2010 WL 7699456, at *2 (citations omitted); David F. Herr, *Effect of Prior Rulings Upon Remand*, Multidistrict Litigation Manual § 10:17 (2019). Therefore, the Court will treat the nine unadopted rulings as the law of the case.

The parties have not explicitly contended that any extraordinary circumstances warrant diverging from these rulings under the law of the case doctrine, but Ethicon raises one cogent concern that relates to adoption of the nine opinions. In its three supplemental briefs, the defendants argue that certain experts' testimony should be completely excluded (rather than excluded in part under the MDL rulings) because they pertain only to Cutter's products liability claims that the Court dismissed in its January 9, 2020 summary judgment order.[3] [Record Nos.

---

[3] The Court entered summary judgment on January 9, 2020, in favor of Ethicon on 14 of 18 claims alleged in the second amended short-form complaint. [Record No. 148] The dismissed claims included those for "strict liability–manufacturing defect" (Count 2), "strict liability–failure to warn" (Count 3), "strict liability– defective product" (Count 4), and "strict liability–design defect" (Count 5). [*Id.*] Cutter's remaining claims include fraudulent concealment

149, p. 2, 150, pp. 2-3, and 151, p. 2]  Ethicon only makes this point for the *Daubert* motions

relating to the three supplemental briefs, but it is generally worth considering whether the nine

MDL rulings (which grant, in part, and deny, in part, the parties' *Daubert* motions) should be

adopted at all given the dismissal of the products liability claims.

The Court declines to disregard the MDL court's opinions and issue a blanket exclusion

of the entire testimony of any of the nine general experts because their opinions may be

relevant to the remaining claims.   For example, Cutter maintains a Kentucky state law

negligent infliction of emotional distress ("NIED") claim.   NIED requires a plaintiff to prove,

*inter alia*, the elements of a common law negligence claim, *i.e.* duty, breach, causation, and

injury.  *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012).  Thus, although the products liability

claims have been dismissed, expert testimony regarding Ethicon's alleged negligence may be

relevant the parties' arguments at trial regarding duty, breach, or causation for the NIED

claim.[4]

---

(construed as fraud by omission) (Count 7), negligent infliction of emotional distress (Count 10), violation of consumer protection laws (Count 13), and unjust enrichment (Count 15).

[4] Cutter also maintains a fraud by omission claim, which requires a plaintiff to show that she suffered damages as a result of "the defendant's failure to disclose the material fact [that] induced the plaintiff to act."  *Republic Bank & Trust Co. v. Bears Stearns & Co., Inc.*, 683 F.3d 239, 255 (6th Cir. 2012) (citing *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011).  The Court notes that while some expert testimony could be relevant to this claim, most testimony that potentially relates to it is no longer relevant because, as the Court found in its summary judgment analysis, "any inadequate warning from Ethicon to [Cutter's implanting physician] Dr. Guiler regarding Prolift risks was not the proximate cause of the alleged injuries in this case."  [Record No. 148, p. 17]  Insofar as any testimony is potentially relevant to the causation or damages elements of a fraud by omission claim, the Court will address the matter below.

Further, the MDL court did not explicitly cabin its *Daubert* opinions to plaintiffs' products liability claims, and it appears that the court considered the relevance of expert testimony to all of the MDL plaintiffs' claims.[5]   The MDL court recycled language throughout the opinions relating to the evidentiary standards governing the admissibility of expert testimony under Rule 702 and *Daubert*.   And it repeatedly stated in these opinions that such testimony's "relevance turns on whether the expert testimony relates to any issues in the case." [*E.g.*, MDL Record Nos. 2642, p. 5 and 2720, p. 5 (citing *Daubert*, 509 U.S. at 591-92)]   The MDL court accordingly considered the relevance of testimony as it pertained to all claims asserted by the MDL plaintiffs, including, for example, the NIED claims asserted on short form complaints like that of Cutter in this case.   [Record No. 27]   The court's broad language regarding relevancy and failure to explicitly say that its opinions *only* relate to products liability-based arguments indicate that its opinions broadly apply to all MDL claims except where the MDL court considered a specific argument that only relates to products liability counts.

Thus, it appears that the appropriate course of action is to adopt the opinions to the extent they grant and deny *Daubert* motions on issues relevant to the remaining claims asserted against Ethicon for its role in producing the Prolift device.[6]   Such issues are pending issues in Cutter's lawsuit, and the opinions are generally the law of the case.   To the extent Ethicon's

---

[5] However, as discussed below, some issues *within* these opinions are only relevant to products liability claims.

[6] The Court notes that the MDL itself concerns a broad range of pelvic implant devices produced by Ethicon.  The general causation *Daubert* motions at issue concern experts who offer testimony regarding the Prolift device implanted in Cutter.  However, these experts offer opinions regarding other devices as well, and it is necessary to limit the Court's adoption of rulings and analysis of remaining issues to those that apply to Cutter's specific case.

argument relating to the continued relevance of expert testimony after summary judgment is an argument that advocates disregarding the unadopted opinions, the Court finds that this is not an extraordinary circumstance that warrants reconsideration of the law of the case. Accordingly, the Court adopts the MDL opinions concerning the testimony of the following experts to the extent they address issues relevant to the remaining claims: Klinge [MDL Record No. 2642], Ulatowski [MDL Record No. 2649], Pence [MDL Record No. 2664], Elliott [MDL Record No. 2666], Rosenzweig [MDL Record No. 2668], Factor [MDL Record No. 2670], Iakovlev [MDL Record No. 2710], McLendon [MDL Record No. 2720], and Thames [MDL Record No. 2723].

### III.  Standard of Review

The remainder of this opinion will examine the outstanding issues of the general and case-specific motions under the well-established standards governing the admissibility of expert evidence.

Rule 702 was amended in 2000 to reflect the Supreme Court's holdings in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  The Rule now generally provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Sixth Circuit has found that, based on the language of Rule 702, an expert's opinion is admissible if it satisfies three requirements. "First, the witness must be qualified by knowledge, skill, experience, training, or education.  Second, the testimony must

be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue.  Third, the testimony must be reliable."  *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2006) (internal quotation marks and citations omitted). "The Court need not hold a *Daubert* hearing to determine the admissibility of expert testimony, but nonetheless must ensure that the disputed testimony is both relevant and reliable."  *Vaughn v. Konecranes, Inc.*, No. 5: 14-136-DCR, 2015 WL 1636431, at *2 (E.D. Ky. Apr. 13, 2015) (citing *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir.2001); *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir.2000)).

### IV.  Unresolved MDL General Causation *Daubert* Motion Issues

The MDL court reserved ruling on a handful of issues relating to the general causation *Daubert* motions it addressed in its now-adopted opinions.  Some of these issues relate to specific *Daubert* motions, while others are "recurring issues" the MDL described in all of its opinions.  The Court has considered the parties' arguments on all issues found in their general causation briefs as well as the MDL court's opinions and finds that a *Daubert* hearing on these unresolved issues is unnecessary.  The Court will address the pertinent issues in turn.

### A.  Unresolved Issues Exclusive to Specific *Daubert* Motions

### 1.  Klinge

The Court has adopted the MDL opinion regarding the testimony of Dr. Klinge.  [MDL Record No. 2642]  Klinge, a potential witness for Cutter, is a German hernia surgeon who has used pelvic mesh products similar to those produced by Ethicon.  He served as a consultant on safe mesh design for Ethicon from 1994 to 2004.  [*See* MDL Record Nos. 2188, p. 2 and 2188-2, p. 2]  The MDL court reserved ruling on one issue specific to Ethicon's motion to limit his

testimony [MDL Record No. 1978], and the parties have not supplemented their briefs regarding the admissibility of his testimony.

The Prolift device that was implanted in Cutter uses Prolene* Soft mesh, or its equivalent, to treat pelvic organ prolapse.  [*See* Record No. 82, pp. 13-14; MDL Record No. 1982, p. 11 (Ethicon stating that the Prolift uses a Prolene Soft* mesh); *see also Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1005 (7th Cir. 2020) (noting that according to Ethicon's representations to the Food and Drug Administration, "Prolift had the same technological characteristics" as "Gynecare Gynamesh PS Prolene Soft Mesh . . . .").]  Ethicon argues that Klinge's opinion regarding the degradation of Prolene* Soft mesh is based almost entirely on observations of its TVT device, which uses a Prolene*, rather than Prolene* Soft, mesh.  [MDL Record No. 1982, pp. 10-12]  The MDL plaintiffs do not directly address this distinction other than to say that "[t]he extent to which Ethicon would seek to make a distinction between the two products is properly suited to be fodder for cross-examination, not grounds for arbitrary exclusion."  [MDL Record No. 2188, p. 10]  The MDL court reserved ruling on this issue, noting that it may be necessary to probe the distinction.  [MDL Record No. 2642, p. 7]

This issue is relevant to the remaining NIED claim, as the degradation of the mesh used in the Cutter's Prolift implant may be pertinent to the alleged negligence of Ethicon.  *See Class Racing Stable, LLC v. Breeders' Cup, Ltd.*, No. 5: 16-200-DCR, 2018 WL 1512611, at *2 (E.D. Ky. March 27, 2018) ("Expert testimony is relevant under [Federal Rule of Evidence] 702 and *Daubert* if it will assist the trier of fact to better understand the evidence or to decide a material fact in issue.") (citing *In re Scrap Metal Antitrust Litigation*, 527 F.3d at 529). Further, Klinge's testimony is sufficiently reliable.  His Federal Rule of Civil Procedure 26 report states that his research on the Prolift device, published in peer-reviewed articles,

- 10 -

evidenced degradation similar to that of the TVT device.  [MDL Record No. 1978-10, pp. 15-16, 22-23]  The expert also stated that he observed the same signs of degradation in Prolift implantation videos.  [*Id.* at p. 24]  Klinge's methods, particularly his research regarding the Prolift device's degradation, are reliable.  *See United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (noting that "[s]uch factors as testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community should be considered" when determining the reliability of scientific expert testimony) (citing *Daubert*, 509 U.S. at 593-94).

Therefore, the Court will deny Ethicon's motion to the extent it seeks to limit Klinge's testimony on the basis that it primarily concerns mesh distinct from that of the Prolift device. This may be an issue that, as the MDL plaintiffs contend, is "fodder for cross-examination," but it appears to be sufficiently relevant and reliable to survive a *Daubert* motion.

### 2.  Iakovlev

The Court has adopted the MDL opinion regarding Ethicon's *Daubert* motion seeking to exclude general causation testimony of Dr. Iakovlev [MDL Record No. 2710], a clinical pathologist who has tested specimens of Ethicon's mesh products for degradation by using histological stains on explanted medical devices.  The MDL court reserved ruling on the issue of whether Iakovlev's methodology for detecting what he describes as degradation "bark" on Ethicon's products is reliable.  [*Id.* at p. 7]

The Court notes that this testimony is potentially relevant to the remaining NIED claim, as the degradation of the Prolift could relate to the duty, breach, and causation elements of such a claim.  However, while it is clear that Iakovlev's testimony concerns Ethicon's polypropylene-based medical devices, including the Prolift [MDL Record No. 2066-4, p. 8],

- 11 -

it is also evident that it relates to other devices and materials. Iakovlev's testimony regarding device degradation is relevant only to the extent it applies to the Prolift.

Ethicon contends in its MDL brief that Iakovlev's testimony regarding his observations of degradation bark on Ethicon products extracted from women suffering from, *inter alia*, pelvic organ prolapse is unreliable because he had not completed a control *in vitro* laboratory experiment to confirm what he observed from the explanted devices. [MDL Record No. 2070, pp. 4-6] In its supplemental brief submitted on this issue, the defendants emphasize that there continues to be no evidence that Iakovlev has completed such *in vitro* tests. [Record No. 150, pp. 4-5] Further, Ethicon asserts that its own experts have tested polypropylene-based pelvic mesh devices *in vitro* using Iakovlev's histological stain method in a control experiment and have disproven his degradation bark theory. [*Id.*; MDL Record No. 2070, pp. 6-8] Ethicon also argues that Iakovlev's bark degradation theory is unsupported by scientific literature. [MDL Record No. 2070, pp. 8-9] Ethicon's supplement calls attention to two other remand courts which have excluded Iakovlev's testimony due to its unreliability. [Record No. 150, pp. 5-6 (citing *Salinero v. Johnson & Johnson*, No. 1:18-cv-23643-UU, Record No. 235 (S.D. Fla. Sept. 5, 2019); *Kaiser v. Johnson & Johnson*, No. 2:17-cv-114-PPS, 2018 WL 739871, at *1 (N.D. Ind. Feb. 7, 2018)).]

The MDL plaintiffs argue that *in vitro* laboratory testing of Iakovlev's methods is unnecessary to validate his observations of excised *in vivo* polypropylene mesh specimens. They claim that, according to Iakovlev, such an experiment would only "show that the model of *in vitro* degradation[,] which can simulate *in vivo* degradation[,] is usable." [MDL Record No. 2185, pp. 8-11 (quoting MDL Record No. 2185-4, p. 18)] They further contend that Ethicon experts' *in vitro* experiments do not disprove Iaklovlev's theory, divergent histological

light microscopy observations are issues for cross-examination, and the histological stain methodology has been verified by medical and scientific literature.  [*Id.* at 11-17]

Insofar as Cutter seeks to introduce Iakolev's bark degradation testimony, the Court agrees with Ethicon that this opinion should be excluded.  *Daubert* and Rule 702 require that a scientific expert's "inference or assertion" is "derived by the scientific method," such that it is "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Downs v. Perstorp Components, Inc.*, 26 F. App'x 472, 475 (6th Cir. 2002) (quoting *Daubert*, 509 U.S. at 590).  The reliability of an expert's experimental findings (his assertions or inferences) may hinge on whether a specific experiment's methodology has been sufficiently tested and validated.  *See id.*  (stating that a reliability inquiry can involve, *inter alia*, whether "the theory or technique can be and has been tested, has been subject to peer review and publication, has a known potential error rate, and is generally accepted by the scientific community.") (citing *Daubert*, 509 U.S. at 593-94).  Thus, while histological stain and light microscopy methodology may be generally accepted in the scientific community, Iakovlev should have conducted and completed a control *in vitro* experiment to substantiate the methodology employed to obtain his conclusions about *in vivo* degradation of polypropylene-based mesh.  There is no evidence of such a control experiment, and the Court will grant Ethicon's motion [Record No. 2066] to exclude Iakovlev's general causation opinions to the extent they are based on his personal histological stain experiments with polypropylene mesh.

### 3.  Pence

The Court has adopted the MDL opinion regarding Ethicon's *Daubert* motion that attempts to exclude general causation testimony of Dr. Pence, "a specialist in medical device product development, regulatory affairs, and labeling standards."  [MDL Record No. 2664]

The MDL court reserved ruling on two issues. One concerns whether Pence is qualified to offer evidence concerning "whether [the TVT-O and Prosima devices' instructions for use ("IFUs")] are adequate for doctors to obtain informed consent of their patients." [*Id.* at p. 6; MDL Record No. 2078, pp. 14-15] Ethicon's argument on this issue does not pertain to the Prolift device, and it's attempt to exclude such testimony will be denied as moot.

The other reserved issue concerns whether Pence consulted applicable legal standards to form her determinations that the IFUs of Ethicon products, including the Prolift, were insufficient. [MDL Record No. 2664, p. 7; Record No. 151, p. 4] However, as noted, the Court has already essentially addressed the relevance of the Prolift's IFU warnings. In the January 9, 2020 summary judgment opinion, the Court found that "the record is clear that any inadequate warning in the instructions for use (or other Prolift guides) was not the proximate cause of the alleged injuries in this case." [Record No. 148, p. 15] This is so because Guiler, Cutter's implanting physician, testified that he did not consult the Prolift IFUs when performing surgery, and had, in fact, never relied upon such label warnings when determining whether to use a transvaginal mesh device to treat pelvic organ prolapses. [*Id.*]

Thus, to the extent Ethicon now seeks to exclude Pence's testimony on relevance grounds [Record No. 151, p. 2], the motion [MDL Record No. 2075] will be granted as to the second reserved issue. Insofar as Ethicon seeks to exclude this testimony on other grounds, the motion will be denied as moot.

### 4. Rosenzweig

The Court has adopted the MDL opinion regarding the testimony of Dr. Rosenzweig, a pelvic surgeon and urogynecologist general causation expert for the MDL plaintiffs, to the extent it is applicable in Cutter's case. [MDL Record No. 2668] The MDL Court reserved

ruling on two issues specific to Ethicon's *Daubert* motion to exclude opinions of Rosenzweig [Record No. 2047], and both relate to the expert's testimony regarding potential alternative mesh designs and procedures. [MDL Record No. 2668, pp. 6-7]

It is not entirely clear how relevant this specific testimony is to evaluations of the Prolift device (as opposed to other Ethicon implants). But regardless, the issue is moot because the alternative design and procedure testimony ostensibly pertains to products liability claims, all of which have been dismissed on summary judgment. *See Burgett v. Troy-Bilt*, 579 F. App'x 372, 378 (6th Cir. 2014) (noting that Kentucky design defects claims require proof of a "feasible alternative design") (citing *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004)). Alternative design or procedure testimony is not relevant to the general negligence elements of the remaining NIED claim. Therefore, to the extent Ethicon argues that Rosenzweig's opinions on the reserved issues should be excluded based on relevance, the motion [MDL Record No. 2047] will be granted. To the extent Ethicon argues he is unqualified or his opinions are unreliable, the motion will be denied as moot.

### 5. Elliott

The Court has also adopted the MDL court's opinion regarding Ethicon's *Daubert* motion to exclude general causation testimony of Dr. Elliott, "a urogynecologist and an associate professor of urology at the Mayo School of Graduate Medical Education," to the extent applicable in Cutter's case. [MDL Record No. 2666] The MDL court reserved ruling on two issues, which, similar to the unresolved issues of the Rosenzweig general causation *Daubert* motion, concern alternative pelvic organ prolapse treatment procedures and products. Thus, to the extent Ethicon's motion [MDL Record No. 2082] seeks to exclude this testimony because it is irrelevant [MDL Record No. 2085, pp. 1-3; Record No. 151, p. 2], the motion will

be granted as to the remaining issues.  To the extent it seeks to exclude Elliott's testimony on these issues based on other grounds, the motion will be denied as moot.

### 6. Factor

The only pertinent MDL plaintiff *Daubert* motion with a specific unresolved issue is that concerning the testimony of Dr. Factor, a board-certified clinical and anatomical pathologist who chairs the Department of Pathology at Jacobi Medical Center and North Central Bronx Hospital and serves as a professor of pathology at Albert Einstein College of Medicine.  [MDL Record No. 2015]  The other pertinent MDL plaintiff *Daubert* motions only contain unresolved issues recurring throughout the MDL proceeding.

The MDL court reserved ruling on the issue of whether Factor is qualified to offer testimony concerning pelvic mesh properties given his inexperience with the mesh prior to examining twenty explanted mesh samples to prepare for this litigation.  [MDL Record No. 2670, p. 6]  This issue is potentially relevant to the negligence elements of Cutter's NIED claim.  The MDL plaintiffs argue that Factor's expert report indicates that he might offer testimony regarding the general properties of pelvic mesh, opinions he is unqualified to provide considering his inexperience with transvaginal pelvic mesh implants.  [MDL Record No. 2020]  Ethicon contends that the crux of his testimony involves:

> (1) wound healing: acute and chronic inflammation; (2) acute versus chronic inflammatory cells; (3) tissue integration with mesh; (4) factors affecting wound healing with or without mesh; and (5) a general critique of Plaintiffs' expert pathologist Dr. Iakovlev's opinions . . . all areas within Dr. Factor's expertise in the field of pathology, both as they relate to wound healing and inflammation generally, but also as to his review of prosthetics, including mesh.

[MDL Record No. 2135, pp. 3-4]  Further, despite his relative inexperience with gynecological mesh products, Ethicon asserts that "Dr. Factor has studied hundreds of cases of vascular and

- 16 -

valvular procedures with polypropylene and Prolene sutures, and has studied multinucleated giant cells and their association with foreign bodies by light microscopy and electron microscopy." [*Id.* at p. 4]

The Court will grant what is now effectively Cutter's motion to the extent it seeks to exclude testimony regarding properties specific to the Prolift device. However, it appears that Dr. Factor has extensive experience with implanted polypropylene-based products, and the Court will not exclude testimony regarding the general properties of such materials common to pelvic mesh and non-pelvic mesh devices. Therefore, the motion [MDL Record No. 2015] will be granted, in part, and denied, in part, regarding this specific issue.

### B. Unresolved Issues Recurring Throughout MDL *Daubert* Motions

The MDL court reserved ruling on two recurring issues that it discussed in every pertinent *Daubert* motion, including the nine adopted in this opinion as well as the three (Karram, Sirls, and Stanislaus) that were adopted in Cutter's case prior to remand.[7] One issue concerns product design process and control standards testimony while the other involves "testimony on the adequacy of Ethicon's clinical testing and research, physician outreach, or particular product development procedures and assessments otherwise not encompassed by the above discussion." [*See, e.g.*, MDL Record No. 2642, p. 11.] However, as the MDL court noted, its opinions ruled on these points to the extent determinations did not rely on specific states' products liability laws. Thus, to the extent any of these issues remain outstanding in the twelve general causation motions pertinent to Cutter's case, the Court will deny the motions

---

[7] The only outstanding issues from these previously-adopted opinions were the "recurring issues" noted in every MDL *Daubert* opinion. These opinions and corresponding motions contain no specific unresolved issues. [Record Nos. 90-92]

regarding these issues because they are moot after dismissal of Cutter's products liability claims.

## V.  The Case-Specific *Daubert* Motions

Two case-specific *Daubert* motions filed by Ethicon remain pending.  These involve the case-specific testimony of Rosenzweig and Iakovlev.  [Record Nos. 78 and 80]  The MDL court did not resolve any portions of these *Daubert* motions.  The Court has considered the briefs and finds a *Daubert* hearing unnecessary.  Therefore, the Court will address these motions in this opinion.

### A.  Rosenzweig

Ethicon has moved to the exclude Rosenzweig's case-specific testimony.  [Record No. 78] Specifically, the defendants offer four independent arguments to exclude opinions outlined in Rosenzweig's Rule 26 Report: (1) "Dr. Rosenzweig should not be permitted to offer narrative testimony couched in terms of legal conclusions or to opine as to Ethicon's knowledge or intent;" (2) "Dr. Rosenzweig's testimony regarding the adequacy of Ethicon's product warnings or the Prolift Information for Use ("IFU") package insert is irrelevant and, therefore, inadmissible because Plaintiff's implanting physician, Dr. Guiler, did not rely on the IFU for such information;" (3) "Dr. Rosenzweig should not be able to testify that Ms. Cutter's pain is permanent nor that Ms. Cutter will require future surgeries because this testimony is based on speculation and is an incorrect assumption given that all palpable and visible mesh has been removed;" and (4) "Dr. Rosenzweig's causation opinions should be excluded as based only on a faulty differential diagnosis."   [Record No. 79] The Court will address these arguments in turn.

**1.**

The first ground for exclusion has been mooted by summary judgment in this case. Ethicon objects that Rosenzweig's Report improperly "draws legal conclusions by applying law to the facts" regarding the company's disclosure of risks in the Prolift IFU.  [Record No. 79, pp. 5-7]  As noted, the Court has already essentially foreclosed consideration of the Prolift IFU based on Guiler's testimony in Cutter's case.  [Record No. 148, p. 17]  Therefore, the motion will be denied as moot insofar as it seeks relief on this ground.

**2.**

The second ground for exclusion also concerns Ethicon's product warnings and the Prolift IFU.  [Record No. 79, pp. 7-10]  However, Ethicon objects that Rosenzweig's opinions on these issues are irrelevant because Guiler did not rely on the Prolift IFU and was fully aware of the devices risks prior to implanting it in Cutter.  These issues could be considered moot, but because Ethicon has objected based on the *relevance* of such testimony, the Court will grant the motion as to this ground.  Rosenzweig's testimony regarding any product warnings will be excluded.

**3.**

Third, Ethicon challenges the reliability of Rosenzweig's findings that Cutter's pain is permanent and that she will require future surgeries.  [*Id.* at pp. 11-12]  The Court notes that this information is potentially relevant to the causation and damages components of the remaining fraud by omission claim.  And although the injury element of the NIED claim necessarily requires proof of *emotional* injury, evidence documenting the seriousness of Cutter's physical injuries allegedly resulting from Ethicon's negligence relates to the cause of

such an emotional injury.  Accordingly, the Court will address the merits of the motion as it pertains to this issue.

Rosenzweig is a medical doctor with thirty-six years of practical and occasional professorial urogynecological experience involving pelvic floor complications.  [Record No. 78-9, pp. 2-3]  As of the date of his May 4, 2016, expert report, he had performed over 300 surgeries relating to pelvic mesh complications, and he has used the Prolift device in pelvic surgeries in the past.  [*Id.* at p. 3]  He is familiar with Cutter's medical history as well as the medical and scientific literature on such issues, and he conducted a personal examination of the plaintiff.  [*Id.* at pp. 4-23]  He noted that "[o]n vaginal exam there is a ridge of mesh on the left side of the vagina posteriorly . . . . This is firm and does not feel like scar tissue but does feel like synthetic material."  [*Id.* at p. 23]

After reviewing her history and medical literature and conducting this examination, Rosenzweig issued his pain prognosis: "Prognosis is poor.  It is highly unlikely, even with aggressive physical therapy, biofeedback medication use and/or surgical intervention, for Ms. Cutter to have complete resolution of her chronic pain."  [*Id.* at p. 26]  He also issued the following prognosis regarding mesh complications:

> Prognosis is guarded.  It is highly unlikely, even with aggressive physical therapy, biofeedback medication use and/or surgical intervention, for Ms. Cutter to have complete resolution of the mesh erosions, deformation, and contraction unless all mesh can be removed.  More likely than not, she will require future surgery to treat her current symptomatic mesh erosion or mesh deformation or contraction.

[*Id.*]  Rosenzweig stated in his expert report that his prognoses and chance of recovery conclusions were formed "to a reasonable degree of medical certainty."  [*Id.*]

- 20 -

Ethicon argues Rosenzweig's prognoses that Cutter's pain will be permanent and future surgeries will be necessary to excise more Prolift mesh are speculative and unsupported by evidence that indicates all mesh has been removed from the plaintiff's body.  [Record No. 79, pp. 11-12]  Cutter contends that the future pain prognosis is reliably based on the doctor's examination of Cutter and that the opinion regarding future mesh excision surgeries is based on this examination as well as the record.  [Record No. 84, pp. 10-12]

Retained medical experts' prognoses are not *per se* speculative and unreliable under *Daubert* and Rule 702.  *See*, *e.g.*, *Battaglia v. United States*, No. 1:07CV778, 2010 WL 11561513, at *3 (N.D. Ohio Sept. 9, 2010).  However, speculative medical prognoses are inadmissible, and "to a reasonable degree of medical certainty" are not magic words that ensure testimony's admissibility when attached to a doctor's opinion.  *See Johnson v. Memphis Light Gas & Water Division*, 695 F. App'x 131, 136-37 (6th Cir. 2017) (citations omitted); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (citations omitted).  In other words, the Court must look past a medical expert's assertion that a prognosis is not speculative and determine whether that prognosis is sufficiently reliable to be presented to a jury.

Here, Rosenzweig's pain and future pelvic mesh surgery prognoses are not speculative and are sufficiently reliable.  Rosenzweig has extensive experience with problems that arise from pelvic organ prolapse surgeries.  His pain and future mesh surgery opinions are based on reviews of Cutter's medical records and relevant medical literature as well as his own examination of Cutter.

And although the parties have sought a determination by the Court (here and at the summary judgment stage) that Cutter does or does not have any pelvic mesh remaining in her body, the evidence presents no obvious answer.  The records from Cutter's last mesh removal

surgery in 2012 and the testimony of the excision surgeon, Dr. John Jelovsek, may suggest, but do not definitively show, that all mesh has been removed.  [Record Nos. 78-6, p. 12 and 78-8, p. 3]  Rosenzweig's 2016 report indicates that he detected what he thought to be pelvic mesh during his examination of the plaintiff.  To the extent the issue is still relevant to the remaining claims, whether any pelvic mesh remains in Cutter's body will be a question for the jury.

Rosenzweig has demonstrated sufficient expertise and has applied a reliable method to form his opinions on future pain and mesh complications.  *See* Fed. R. Evid. 702.  Therefore, Ethicon's motion will be denied insofar as it seeks to exclude Rosenzweig's testimony regarding future pain and mesh surgeries.

## 4.

Fourth, Ethicon contends Rosenzweig's opinion that the Prolift device implant has already caused various health problems is based on a faulty differential diagnosis or etiology. [Record No. 79, pp. 12-15]  This issue is generally relevant to proving causation in the fraud by omission and NIED context because Cutter must prove that her alleged injuries relating to these claims (physical and emotional) were caused by the Prolift.  Accordingly, the Court will address the merits of this issue.

Ethicon challenges a number of Rosenzweig's causation conclusions.  The defendants assert that Rosenzweig improperly concluded that the Prolift caused Cutter's bowel dysfunction because he did not account for the facts that she had similar problems before the Prolift was implanted in 2006 and has had the same issue since Jelovsek excised the remaining mesh in 2012.  [*Id.* at p. 13]  Ethicon also contends that Rosenzweig's opinions regarding

urinary dysfunction (hematuria, dysuria, and incontinence)[8] evidence a faulty differential diagnosis. Ethicon states that Rosenzweig ignored the fact that Cutter's urinary dysfunction did not arise until after the last of her excision surgeries and that the incontinence specifically was attributable to a cold she had prior to his 2016 examination. [*Id.* at pp. 13; Record No. 86, p. 6] Moreover, the defendants argue that Rosenzweig's conclusion that urinary tract infections will become more frequent as a result of "pelvic confusion" caused by the Prolift fails to account for pelvic confusion indicators that preexisted the implant. [Record No. 79, pp. 13-14] Further, Ethicon requests exclusion of Rosenzweig's testimony that Cutter's dyspareunia was caused by the Prolift's reaction with her body, contraction, or degradation to the extent this opinion is based on Jelovsek's records that indicate the contrary.[9]

Cutter contends that Rosenzweig conducted a proper differential diagnosis analysis. She asserts his conclusions account for the ridge of mesh he detected during his examination of the plaintiff. [Record No. 84, pp. 13-14] Cutter argues that he based his bowel dysfunction conclusions on medical literature and the findings of a prior treating physician, Dr. Papp, that the mesh pressured her rectum. [*Id.* at p. 13] Further, she states his urinary dysfunction opinions are based on her medical history and his physical exam. [*Id.*] Cutter also argues that Rosenzweig outlined his differential analysis regarding infections during his deposition when

---

[8] Hematuria is a medical term for blood in urine. Blood in Urine (Hematuria), https://www.mayoclinic.org/diseases-conditions/blood-in-urine/symptoms-causes/syc-20353432 (last visited Apr. 17, 2020). Dysuria is a medical term for painful urination. Painful Urination (Dysuria), https://www.mayoclinic.org/symptoms/painful-urination/basics/causes/sym-20050772 (last visited Apr. 17, 2020).

[9] Dyspareunia is a medical term for painful intercourse. Painful Intercourse (Dyspareunia), https://www.mayoclinic.org/diseases-conditions/painful-intercourse/symptoms-causes/syc-20375967 (last visited Apr. 16, 2020).

he stated that he considered her medical history to rule out menopause and vulvovaginal atrophy as causes of recent urinary tract infections.  [*Id.* at pp. 13-14]  Similarly, Cutter insists that Rosenzweig detailed his differential analysis regarding dyspareunia, as he testified that his opinion was based on her medical and surgical history and that he ruled out her fibroids, ovarian cysts, gallbladder, disc protrusion, vulvovaginal atrophy, and prior surgeries as causes of the condition.  [*Id.* at pp. 14-15]

Ethicon generally challenges Rosenzweig's etiology (*i.e.*, what caused Cutter's diagnosed medical problems).  *See Tamraz*, 620 F.3d at 669 ("To put the distinction in medical terms, [the defendants] challenge Dr. Carlini's etiology (what caused the disorder diagnosed?), not his diagnosis (what disorder caused the set of symptoms observed?)").  The Sixth Circuit has articulated a three-part inquiry to determine the reliability of a differential etiological expert analysis:

> (1) Did the expert make an accurate diagnosis of the nature of the disease?  (2) Did the expert reliably rule in the possible causes of it?  (3) Did the expert reliably rule out the rejected causes?  If the court answers "no" to any of these questions, the court must exclude the ultimate conclusion reached.

*Tamraz*, 620 F.3d at 674 (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009)).  Etiological opinions that tend to rest on speculation, rather than a sufficient rule in/rule out analysis, are inadmissible because they are not based on "reliable principles and methods" as required by Rule 702.  *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 678-79 (6th Cir. 2011) (citing *Tamraz*, 620 F.3d at 670, 674).  Here, Ethicon does not argue that Rosenzweig improperly diagnosed Cutter's medical problems and only contends that the doctor did not properly rule in and rule out potential causes.

The defendants' arguments regarding bowel and urinary dysfunction are premised, in part, on the point that Rosenzweig has improperly concluded that Cutter still has mesh in her body despite evidence to the contrary.  But as noted, this issue remains unresolved, and he claims his examination revealed a mesh ridge.  Rosenzweig's deposition testimony suggests that he accounted for Cutter's bowel dysfunction issues predating the implant, but he nevertheless concluded that the Prolift was causing bowel dysfunction based on medical literature, his examination, and prior findings that the mesh pressured her rectum.  [Record No. 84-6, p. 22]  He also testified that he considered her medical history of multiple types of urinary dysfunction to rule in and rule out potential causes and indicated that although recent incontinence appeared to be related to a cold, the condition persisted after the cold.  [*Id.* at p. 21]  Therefore, it appears that Rosenzweig sufficiently ruled in and ruled out causes based on his understanding of Cutter's medical history, the relevant medical literature, and his examination of the plaintiff.

Rosenzweig's opinion regarding urinary tract infections also involved a sufficient differential etiology.  Rosenzweig attributes Cutter's urinary tract infections to "pelvic confusion," *i.e.*, levator muscle tenderness, caused by the Prolift that results in constipation and infections.  [*Id.*]  Rosenzweig acknowledged during his deposition Cutter had pelvic confusion prior to the 2006 implant.  [*Id.*]  However, his report indicates that Cutter had pelvic confusion when he examined her in 2016 and notes that she had been experiencing more frequent infections.  [Record No. 84-1, pp. 22-23]  His deposition testimony indicates that he considered her prior history of pelvic confusion as well as other issues presented in her medical and surgical history when he formed his causation opinion regarding the recent uptick of urinary tract infections.  [Record No. 84-6, p. 21]  He also ruled out Cutter's 2006 hysterectomy

- 25 -

(performed when the Prolift was implanted), menopause, and vulvovaginal atrophy as the causes of the recent infections. [*Id.*] When considered alongside the more recent frequency of infections and his belief that some mesh remains in Cutter's body, Rosenzweig's thoroughness indicates that his causation opinion on the causes of the infections is grounded in a sufficient differential etiological analysis rather mere speculation.

Additionally, Rosenzweig provided a comprehensive description of his rule in/rule out analysis regarding the cause of Cutter's dyspareunia. He considered her extensive medical and surgical history unrelated to the Prolift. [*Id.* at p. 20] He ruled out Cutter's fibroids, ovarian cysts, and gallbladder because these had been removed prior to her dyspareunia. [*Id.*] He ruled out vulvovaginal atrophy because it was mild and was being treated at the time of his examination. [*Id.*] He also ruled out various surgeries to repair the Prolift because they would not have caused the dyspareunia. [*Id.* at pp. 20-21] He ruled in the Prolift because he believed that she had mesh in her body that could have "undergone contraction, degradation, chronic foreign body reaction, [and] chronic inflammatory reaction." [*Id.* at p. 20] Ethicon appears to argue that Rosenzweig's analysis diverges from the state of Cutter's pelvic region at the time of the 2012 excision surgery, but this does not necessarily compel the conclusion that mesh complications did not arise after that date when considered with the expert's opinion that some mesh remains in her body. Rosenzweig offered a thorough rule in/rule out analysis regarding the potential causes of Cutter's dyspareunia, and his causation opinion satisfies the demands of Rule 702 as it pertains to differential etiology.

All of Ethicon's exclusion arguments concerning Rosenzweig's etiologies fail. Therefore, the motion will be denied as to this fourth ground for exclusion.

**B. Iakovlev**

Ethicon also challenges the case-specific testimony of Iakovlev.  [Record No. 80] Iakovlev examined slides of excised portions of Cutter's pelvic mesh, reviewed some of Cutter's clinical records, and rendered clinico-pathological opinions about the causes of Cutter's health problems based on correlations between clinical records and his pathological review of specimens.  [Record No. 80-7]

Specifically, the defendants offer six exclusion arguments: (1) Iakovlev is not qualified to opine about clinico-pathological correlations; (2) Iakovlev's opinions regarding mesh erosion are based on a flawed methodology; (3) Iakovlev's opinions regarding mesh degradation are based on a flawed methodology; (4) Iakolvev's pain (vaginal and pelvic pain and dyspareunia) causation opinions are speculative and unreliable; (5) Iakovlev's prognoses regarding future mesh complications and pain are speculative and unreliable; and (6) insofar as the Court allows Iakovlev to testify, it should not allow him to show altered photographs of mesh slides to the jury.  [Record Nos. 81, p. 6-13 and 87, pp. 1-6]

As is the case with some of Rosenzweig's case-specific testimony, the testimony at issue is pertinent to the remaining claims in this case because it relates to the causes of Cutter's alleged physical (and potentially emotional) injuries.  The Court, therefore, will address these arguments individually.

**1.**

Iakovlev's case-specific expert report offers certain opinions regarding clinico-pathological correlations between his pathological and prior clinical analyses to demonstrate causation of Cutter's health problems.  [Record No. 80-7]  Ethicon challenges the qualifications of Iakovlev to offer such opinions.

- 27 -

Iakovlev's deposition testimony describes his role as a clinical pathologist who conducts morphological, rather than clinical, differential analyses:

> So when a patient comes in with a problem, first clinicians take history, then they order some additional tests and they perform physical examinations. So they start working up through differential diagnosis, which is several entities which they keep in mind. And then they narrow it down to a specific area. And if their decision is that it has to be excised, they excise it. However, at that point, there are still possibilities of what can be abnormal in that tissue. That's where pathologists come in, and they continue the differential diagnosis as a morphological differential diagnosis. That's what I do. I determine what is pathological in the excised tissue, which was clinically determined to be problematic and causing the symptoms.

[Record No. 85-3, p. 24]  Iakovlev's expert opinions in Cutter's case go a step further and correlate his morphological and pathological findings to her clinical history to form conclusions about mesh as a cause of Cutter's health problems.  [Record Nos. 80-7 and 85-3, p. 22]

Ethicon does not challenge Iakovlev's qualifications to offer expert testimony relating to his pathological findings.  Instead, the defendants insist that Iakovlev is not qualified to form conclusions based on a correlation between his pathological analysis and preceding clinical analyses because "he is not a gynecologist, a urologist or a clinician of any type" and "does not examine or treat women for gynecologic or urogynecologic issues."  [Record No. 81, p. 7]  In other words, the defendants contend that because Iakovlev is not the type of doctor who actually performs clinical differential diagnoses (or etiologies), he is unqualified to offer opinions that are based, in part, on such analyses.

But as Cutter indicates, it appears that Iakovlev has extensive experience conducting the type of causation analysis that he performed in this case.  [Record No. 85, pp. 3-4]  He testified that the process by which he formed his opinions did not vary from that of his normal

practice.  [Record No. 85-3, p. 24]  He further indicated that he generally relies on clinical records to form opinions and conduct clinico-pathological correlations.  [*Id.* at pp. 24-25]  This testimony echoes the job-description provided in his MDL general causation expert report: "As a clinical physician, I provide clinical consultations to physicians at St. Michael's Hospital, which requires me to examine pathology specimens, review clinical information relating to the patient, and reach conclusions about the cause of a patient's injuries or illnesses."  [MDL Record No. 2066-4, p. 2]  He does this in 3,000-5,000 cases annually.  [*Id.*] His practice routinely involves the consideration of clinical findings in light of his morphological and pathological findings, and Ethicon has not offered any persuasive argument that this is beyond the bounds of his expertise.

Further, Ethicon made a similar argument to the MDL court in its motion to exclude Iakovlev's general causation testimony, contending that "Iakovlev lacks specialized knowledge sufficient to testify regarding potential injuries to the female body."  [MDL Record No. 2070, pp. 15-16]  The MDL court denied the motion regarding this point, noting that "Iakovlev is a highly experienced clinical pathologist, and he is qualified to render his complications opinions based on his knowledge, skill, education, and experience."  [MDL Record No. 2710, p. 10]

The Court's conclusion on this issue comports with that of the MDL court in its general causation opinion.  Thus, Ethicon's case-specific causation motion will be denied as to the issue of Iakovlev's qualifications.

**2.**

Ethicon next challenges the methodology of Iakovlev's mesh erosion opinions.  The defendants' arguments appear to be two-fold: (1) Iakovlev used a flawed methodology

because, as was the case in the general causation context, he relied on methods without a control group; and (2) he used a flawed methodology (etiology) because the specimens he observed did not demonstrate erosion. [Record No. 81, pp. 10-11] Cutter only addresses the etiology point, arguing that deposition testimony proves he conducted an appropriate etiology. [Record No. 85, p. 7]

Ethicon relies on its briefing from the MDL general causation motion for its first argument. [Record No. 81, p. 10 (citing MDL Record No. 2070, p. 11)] However, this general causation challenge involved mesh degradation, not erosion, and Iakovlev's case-specific report's findings regarding erosion do not cite his experiments with histological stains at issue in the dispute regarding degradation. [Record No. 80-7, pp. 15-16; MDL Record No. 2070, p. 11] Therefore, this argument is unpersuasive.

But Ethicon's second argument is persuasive. Iakovlev attributes a variety of Cutter's problems to mesh erosion due to clinical observations of erosion even though his report states he did not observe such erosion in the specimens he examined. [Record No. 80-7, pp. 15-16] The report does not document a thorough pathological etiology of erosion, and the deposition transcript portion cited by Cutter does not concern an etiology indicating that erosion specifically caused medical problems. [Record No. 85-3, pp. 19-20] Therefore, Ethicon's motion will be granted regarding this point, and Iakovlev's testimony involving mesh erosion will be excluded.

### 3.

Next, Ethicon contends that Iakovlev's case-specific mesh degradation opinions are based on a flawed methodology. This *is* the same argument as that of the general causation motion concerning Iakovlev's use of histological stains to detect degradation bark. [*See*

Record No. 81, pp. 11-12.]   And Iakovlev's case-specific report explicitly cites to his histological stain experiment on Cutter's specimens as the source of his conclusion that the Prolift had degraded.   [Record No. 80-7, p. 16]   Therefore, for the same reasons described above in the general causation motion analysis, the Court will grant Ethicon's motion regarding this point.   Because Iakovlev's conclusion that Cutter's Prolift degraded appears to be based entirely on his own experiments that lack a control group, all case-specific testimony on mesh degradation will be excluded.

**4.**

Ethicon also argues that Iakovlev's past pain causation opinions should be excluded because they are speculative and unreliable.   The defendants proceed with a number of points, but they all fall under two broad and related arguments: (1) Iakovlev performed an inadequate clinical differential etiology himself by forming pain (dyspareunia as well as pelvic and vaginal pain) causation opinions without appropriately ruling in and ruling out potential causes; and (2) his clinico-pathological causation opinions on these issues are unreliable because they are not informed by and consistent with an adequate review of Cutter's medical history.   [*See* Record Nos. 81, pp. 7-10 and 87, pp. 1-4.]

This first line of argument presupposes that Iakovlev himself has provided what is essentially a clinical differential etiology by considering former physicians' clinical etiologies as well as his morphological etiologies to form clinico-pathological correlation opinions.   It is clear that Iakovlev is not qualified to conduct his own clinical etiologies.   However, his opinions do not do that.   Instead, they take the preexisting clinical etiologies at face value and compare them with his own morphological etiologies.   As he stated in his expert report:

> The clinical differential [etiologies prior to Cutter's mesh excision surgeries] had already been performed and resulted in mesh excision. The purpose of my review is to collect the clinical information related to the examined specimen before I perform the morphological differential diagnosis and correlate the pathological changes to the clinical information.

[Record No. 80-7, p. 2]  As noted above, this appears to be within Iakovlev's sphere of expertise.

But the better question is whether the clinico-pathological correlation opinions at issue are sufficiently informed by, and consistent with, preexisting clinical records.  Cutter insists that they are [Record No. 85, pp. 4-7], but Ethicon offers multiple persuasive reasons why they are not.  [Record No. 87, pp. 1-4]  For example, Iakovlev acknowledged during his deposition that he understood from medical records that Cutter's pelvic pain existed since 2000, but he only lists preexisting pelvic pain once in his report when discussing conditions at the time of Cutter's 2006 implant. [Record No. 85-3, pp. 17, 30]  Further, he admitted that Cutter's records showed existing vaginal atrophy, but this is not correlated in the pain and dyspareunia sections of his expert report.  [*Id.* at p. 18]  He also acknowledged that records documented diverticulosis in 2008 but stated that he did not include this in his correlation pelvic-area pain analyses because he did not have specimens from Cutter's colon.  [*Id.* at p. 20]

Simply put, it appears that Iakovlev's pain and dyspareunia correlation analyses only account for medical records that support his pathological opinions that the mesh caused Cutter's health problems.  Because his correlation analyses on these issues are not based on reliable principles and methods, Ethicon's motion will be granted regarding this point.  All case-specific testimony regarding past vaginal and pelvic pain and dyspareunia clinico-pathological correlation opinions will be excluded.

**5.**

Next, Ethicon argues that Iakovlev's future mesh complications and pain prognoses should be excluded because they are speculative.  As relevant here, Iakovlev's report states: "the residual parts of the mesh that were not removed during the excisions, as well as scarring caused by the mesh and the excision surgeries continued and continue to pose a risk for pain [and dyspareunia] for Ms. Cutter."  [Record No. 80-7, p. 15]  Ethicon claims these opinions are unreliable and speculative because they are not based on any significant indication that Cutter has mesh remaining in her body.  [Record Nos. 81, pp. 12-13 and 87, pp. 4-6]  Cutter does not substantially respond to this argument other than to say that deposition testimony from several treating physicians indicate that mesh may remain in Cutter's body and that the jury should weigh evidence to resolve any dispute over the qualifications of Iakovlev to offer prognoses.  [Record No. 85, pp. 6-7, 9]

The Court agrees with Ethicon on this issue.  Iakovlev's deposition testimony reveals that he did not consult any treating physicians' depositions regarding remaining mesh or future scarring and other complications.  [Record No. 85-3, p. 14]  And unlike Rosenzweig, he has never met Cutter or performed an independent examination that revealed signs of remaining mesh.  [*Id.*]  It is unclear why Iakovlev believes that mesh remains and could cause future injuries.  Therefore, without deciding whether mesh remains, the Court concludes that his prognoses regarding future mesh complications and pain are speculative and unreliable.  The motion will be granted regarding this point, and testimony regarding future complications and pain will be excluded.

**6.**

Ethicon's final case-specific exclusion argument is that any admitted Iakovlev testimony should not include photographs of mesh specimen slides that have been manipulated, adjusted, or enhanced for the jury. [Record Nos. 81, p. 13 and 87, p. 6]  Ethicon insists that the original photographs will be necessary for authentication under Rule 1002, the altered photographs would be misleading and prejudicial under Rule 403, and it is Iakovlev's job to explain to the jury what he has found using unaltered photographs (*i.e.*, pictures of the slides as he examined them).  [*Id.*]  Cutter maintains that altered photographs are relevant and would be helpful for the jury to understand very complicated and technical testimony.  [Record No. 85, p. 10]

The Court notes that the preceding sections regarding the limitation of Iakovlev's case-specific testimony have excluded the vast majority of his clinico-pathological correlation opinions.  Insofar as any have not been excluded and to the extent Cutter may have Iakovlev testify regarding *purely* pathological findings,[10] it may be necessary for Iakovlev to show the jury photographs of his specimen slides.

That said, this issue is better left for trial.  The parties do not appear to dispute the intention of Iakovlev to use altered photographs during his testimony, but they have not actually produced such depictions of Cutter's slides for the Court's review.  Therefore, the Court cannot make a determination regarding their admissibility at this time and will deny the motion without prejudice.  If the admissibility of photographs is disputed at trial, Ethicon may

---

[10] Of course, consistent with this opinion, Cutter cannot offer purely pathological testimony involving Iakovlev's erosion and bark degradation opinions because his pathological analyses are unreliable.

renew the motion and the Court will resolve the matter after considering the proffered evidence.

## VI.

Based on the foregoing analysis, it is hereby

**ORDERED** as follows:

1.      The following previously unadopted MDL court general causation *Daubert* motion opinions are **ADOPTED** to the extent they are applicable to Plaintiff Jenesta Cutter's remaining claims:  Klinge [MDL Record No. 2642], Ulatowski [MDL Record No. 2649], Pence [MDL Record No. 2664], Elliott [MDL Record No. 2666], Rosenzweig [MDL Record No. 2668], Factor [MDL Record No. 2670], Iakovlev [MDL Record No. 2710], McLendon [MDL Record No. 2720], and Thames [MDL Record No. 2723].

2.      Insofar as any general causation motions discussed in this opinion seek relief regarding the MDL court's two unresolved "recurring issues," those motions are **DENIED** as **MOOT** regarding such issues.

3.      Defendants Ethicon, Inc. and Johnson & Johnson's general causation motion to exclude testimony of Klinge [MDL Record No. 1978] is **DENIED** regarding the single issue previously reserved by the MDL court.

4.      Ethicon's general causation motion to exclude Iakovlev's testimony [MDL Record No. 2066] is **GRANTED** regarding the single issue previously reserved by the MDL court.

5.      Ethicon's general causation motion to exclude Pence's testimony [MDL Record No. 2075] is **GRANTED**, in part, and **DENIED** as **MOOT**, in part, regarding the two issues previously reserved by the MDL court.

- 35 -

6.      Ethicon's general causation motion to exclude Rosenzweig's testimony [MDL Record No. 2047] is **GRANTED**, in part, and **DENIED** as **MOOT**, in part, regarding the two issues previously reserved by the MDL court.

7.      Ethicon's general causation motion to exclude Elliott's testimony [MDL Record No. 2082] is **GRANTED**, in part, and **DENIED** as **MOOT**, in part, regarding the two issues previously reserved by the MDL court.

8.      Cutter's general causation motion to exclude Factor's testimony [MDL Record No. 2015] is **GRANTED**, in part, and **DENIED**, in part, regarding the single issue previously reserved by the MDL court.

9.      Ethicon's case-specific motion to exclude Rosenzweig's testimony [Record No. 78] is **GRANTED**, in part, **DENIED**, in part, and **DENIED** as **MOOT**, in part.

10.     Ethicon's case-specific motion to exclude Iakovlev's testimony [Record No. 80] is **GRANTED**, in part, and **DENIED**, in part.

Dated:  April 29, 2020.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky